MEDINA LAW FIRM LLC  
641 Lexington Avenue  
Thirteenth Floor  
New York, NY 10022  
Tel. (212) 404-1742  
Fax. (888) 833-9534  
*Attorneys for the*  
*Reorganized Debtor*

Hearing Date: October 29, 2015  
Time: 10:00 a.m.

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

In re:

    PINE TREE HOUSE, INC. D/B/A  
    KANG SUH RESTAURANT,

    Reorganized Debtor.

Chapter 11

Case No. 14-10702 (SMB)

**REORGANIZED DEBTOR'S OBJECTION TO MOTION OF
JTMH 1250 OWNER LP FOR AN ORDER: (I) TERMINATING,
VACATING, ANNULLING OR, ALTERNATIVELY, MODIFYING
THE AUTOMATIC STAY, (II) GRANTING ADEQUATE
PROTECTION AND (III) FOR THE GRANTING OF OTHER RELEIF**

Pine Tree House, Inc., d/b/a Kang Suh Restaurant ("PTH" or the "Debtor"), by and through its undersigned counsel MEDINA LAW FIRM LLC, as and for its objection to the Motion of JTMH 1250 Owner LP (together with previous owners and lessors of the premises, the "Landlord") for an Order: (i) Terminating, Vacating, Annulling or, Alternatively Modifying the Automatic Stay; (ii) Granting Adequate Protection; and (iii) for the Granting of Other Relief (the "Motion"), respectfully represents as follows:

**PRELIMINARY STATEMENT**

JT MH 1250 Owner LP (the "Landlord") seeks relief from the automatic stay to pursue its rights against the Debtor under that certain lease (the "Lease") for property located at 2150 Broadway, New York, New York (the "Leased Premises"). The Landlord bases its Motion on

{00020007 }

payments totaling $331,059.14 that it alleges are past due consisting of retail rent, late charges, legal fees, sales tax, water charges and submetered electric.

As a preliminary matter, a significant portion of the late charges – totaling $63,284.92 – date from prior to the Debtor's assumption of the Lease. As such, these amounts were satisfied by the Cure Payment (defined below) that the Landlord accepted when the Debtor assumed the Lease. The remainder of the late charges appear to be charges already assessed to and paid by the Debtor on a monthly basis with its rent. A sample of a rent invoice listing late charges is annexed as **Exhibit 1** to the Affirmation of Julie Choi in Support of this Objection (the "Choi Affirmation") which is annexed hereto as **Exhibit A**. Accordingly, the Debtor disputes the Landlord's claim that it is owed late charges totaling $90,488.45 except to the extent that it still owes rent for the months of September and October.[1]

Additionally, the Landlord seeks legal fees totaling $4,998.93. It is unclear what services were provided to incur these legal fees. Since January 2015, the Debtor has paid more than $17,570.61 in legal fees without questioning them. At this point, the Debtor is concerned about whether the legal fees being incurred by the Landlord are legitimately being attributed to the Debtor.

Finally, of the remaining amounts that the Landlord asserts are past due, the Debtor's new management has indicated that all rent will be caught up through October no later than the second week of November – approximately two (2) week after the hearing on this Motion. The Debtor will pay rent for the month of November by November 30, and the Debtor believes that it can remain current going forward. To facilitate this, new management is prepared to invest an additional $100,000.00. Further, the Debtor has indicated that while a slowdown during the

---

[1] The Landlord states in the Motion that rent has not been paid since July. On October 23, 2015, the Debtor wired the sum of $81,509.55 to the Landlord in payment of August rent.

{00020007 }                                              2

summer months in addition to costs related to its bankruptcy case and other factors beyond its control caused a dip in revenue for a period of time, most of these factors have been resolved. As such, the Debtor anticipates that as of November 30, 2015, it will be current with its obligations to the Landlord and will able to remain so.[2]

As discussed below, the Debtor's finances have improved significantly since its plan of reorganization (the "Plan") was confirmed by this Court on May 20, 2015 and a sharp upward trajectory is anticipated during the more lucrative winter months because of seasonal variations in the industry but also because of substantial changes made by new management. The Debtor is slightly behind in its obligations to the Landlord, but these will be satisfied in a brief period of time. Lifting the stay to permit the Landlord to proceed against the Debtor will serve only to cause the Debtor to incur significant additional legal expenses for no real purpose, thus reducing the funds otherwise available to pay ongoing business expenses and potentially causing the business to fail. Further, it would take management's time and attention away from focusing on building revenue to the detriment of all parties, including the Landlord.[3]

## BACKGROUND

1.      On March 20, 2014 (the "Petition Date"), the Debtor initiated a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its business and manage its affairs as a debtor-in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No trustee or examiner has been appointed in these cases, nor has an official committee of unsecured creditors been established.

---

[2] It also should be noted that the Landlord holds a security deposit in the amount of $46,125.00.

[3] Unless, of course, the Landlord's true intention is to use this slight arrearage to force the Debtor to surrender the valuable Lease.

3.      The Debtor's primary business is the operation of the Korean restaurant Kang Suh, located on 32nd and Broadway, in a portion of the ground floor and basement at 1250 Broadway, New York, New York 10006 (the "<u>Leased Premises</u>").

4.      On October 2, 2014, the Debtor filed its Motion for Entry of an Order Authorizing the Debtor to Assume Unexpired Lease of Non-residential Real Property Pursuant to 11 U.S.C. § 365.

5.      On November 14, 2014, the Debtor assumed the Lease and paid to the Landlord the sum of $226,743.09 (the "<u>Cure Payment</u>") to cure the arrearage under the Lease.  The Landlord did not object to the proposed Cure Payment.  Since that time, the Debtor has continued to operate its business at the Leased Premises.

6.      On October 9, 2015, the Landlord filed its second Motion seeking relief from the automatic stay to pursue its rights and remedies against the Debtor in State Court.

## LEGAL ARGUMENT

**I.  <u>The Landlord Cannot Establish Cause to Modify the Automatic Stay</u>**

**A.  <u>The Sonnax Factor Weigh Heavily Against Granting the Motion</u>**

7.      Section 362(d) of the Bankruptcy Code provides, in pertinent part:

**On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . .**

> (1)     for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> (2)     with respect to a stay of an act against property under subsection (a) of this section, if –
> (A)     the debtor does not have any equity in such property; and
> (B)     such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

8.      The movant carries the burden of establishing cause. *In re Mazzeo*, 167 F.3d 139,

{00020007 }                                                   4

142 (2d Cir. 1999) (noting that only after the movant establishes cause doe the burden shift to the debtor, and further that "absent a showing of cause, the court should simply deny relief from the stay.") (citation omitted). When examining whether grounds exist to modify the automatic stay, courts in this Circuit examine a variety of factors including those discussed by the *Sonnax* Court (the "Sonnax Factors"). *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus.)*, 907 F.2d 1280 (2d Cir. 1990). The Sonnax Court identified a non-exclusive list of twelve (12) nonexclusive factors for courts to consider when determining whether it is appropriate to grant a motion for relief from the automatic stay for cause:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*See Sonnax*, 907 F.2d at 1286 (observing that the legislative history "indicates that the facts of each request will determine whether relief is appropriate under the circumstances."); *In re Mazzeo*, 167 F.3d 139, 142 (vacating the orders of the district court and the bankruptcy court and remanding for further findings where, among other failures to establish a record justifying the granting of relief from the stay, the lower courts failed to examine the Sonnax Factors). Not all factors are relevant in every case. *In re Mazzeo*, 167 F.3d 139, 143 (2d Cir. 1999). Neither the Sonnax Factors nor any other factor provided by the Landlord support granting relief from the

stay to allow this matter to proceed in another court.

9. <u>Complete resolution</u>. While the State Court proceeding would provide the Landlord with complete resolution of its issues, the Landlord will obtain a prompter resolution merely by waiting less than two (2) weeks, at which time the Debtor will be current on its rent. Both parties will save wholly unnecessary costs (which the Debtor may be required to bear under the Lease). It is therefore unnecessary for the Landlord to pursue remedies in State Court.

10. <u>Connection to the bankruptcy case</u>. Lifting the stay to allow the Landlord to proceed in State Court would be disastrous for the Debtor. First, the Leased Premises are integral to the Debtor's reorganization. The Debtor has operated at the Leased Premises since its inception. Moreover, the Korean Embassy recently relocated to a location near the Leased Premises. The Debtor believes that this will result in increased business both in terms of walk in and catering. Also, while the Debtor is regaining its financial health, it still lacks the financial wherewithal to move to a new location, renovate as would likely be necessary, and market its new location to existing and new clients. Further, the cost of financing the State Court action would likely have a significantly detrimental impact on the Debtor. The Debtor would be required to expend additional monies on legal fees that otherwise are used to pay operating expenses of the business. This very likely would result in the complete failure of the Debtor.

11. <u>Availability of insurance</u>. No insurance company has assumed responsibility for the Debtor's defense in any State Court proceeding, and accordingly the Debtor would bear the burden of obtaining counsel in another proceeding to defend its interests. It likely would not be able to shoulder this financial burden, and the result likely would be conversion of the case.

12. <u>No third parties</u>.  The action involves the Landlord and the Debtor, two parties currently before this Court.  There is no reason why another court should become involved at this time.

13. <u>Prejudice to other creditors</u>.  The cost of the State Court action proposed by the Landlord, in terms of time and attention as well as money, as stated above, likely would bankrupt the Debtor.  If the Debtor ceases to be financially viable, creditors will receive no further payments and approximately forty (40) employees will lose their source of income.

14. <u>Judicial economy</u>.  Nor does modifying the stay result in a more expeditious or economical resolution.  As previously stated, if the Landlord merely waits less than two (2) weeks' time, it will be paid in full without any further action required on its part.  To the extent that judicial intervention is required, all the parties are before this Court, which is intimately familiar with the parties and the underlying facts of the case.  The Bankruptcy Court "provides a single, expeditious forum for resolution" of this bi-party dispute.  *See Sonnax* at 1287.

15. <u>Parties are not trial ready</u>.  No proceeding yet has been commenced in State Court with regard to the issues raised in the Motion, and accordingly the parties would be far from ready to conduct a trial on the merits.[4]

16. <u>Balance of harms</u>.  In balancing the harms, too, it is clear to see that lifting the stay would disproportionately harm not only the Debtor but the other creditors of the estate.  The cost of the additional proceeding will likely force the debtor into liquidation.  Creditors will cease to receive distributions.  Jobs will be lost.  Further, the Landlord itself likely will not be paid.  If the stay is not listed, however, the Landlord will receive its past due rent and will incur

---

[4] The Landlord did bring an unrelated action in State Court, styled *JT MH 1250 Owner vs. Pine Tree House, Inc. et al*. Index No. 52633/2014 in the New York County Court, Part 52.

no expense in so doing. Thus, the *Sonnax* Factors make clear that denying the Motion creates the greatest benefit overall.

### B. The Premises are Necessary for the Debtor's Successful Reorganization

17. Section 362(d)(2) provides an additional ground to modify the automatic stay, providing in pertinent part that a court may grant relief from the automatic stay where:

> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization;

**11 U.S.C. § 362(d)(2).**

18. The Premises are wholly necessary for the continued success of the Debtor's reorganization. Indeed, maintaining the Premises was a key component in the Debtor's ability to confirm the Plan. Absent the Premises, the Debtor would be forced to find a new location from which to operate. It also would likely be required to build the new space out. While the Debtor is regaining its financial health, it still lacks the time and resources to relocate at this time, and already has spent significant funds on the Leased Premises. Accordingly, the case would be converted absent the Debtor's ability to use the Leased Premises.

### C. The Debtor's Profits are Growing Steadily

19. In addition to the fact that the Landlord cannot establish cause to lift the stay, it bears note that the Debtor's new management has taken significant steps to ensure the success of the Debtor's business. As detailed more fully in the Choi Affirmation, a copy of which is annexed hereto as **Exhibit A**, in addition to the initial $300,000.00 invested by Julie Choi to purchase seventy-five percent (75%) of the Debtor business under the Plan, Ms. Choi is investing an additional $100,000.00 to ensure that the Landlord will be paid as soon as possible for all past-due rent. Further, Ms. Choi and her new management team have made and continue to make significant changes to the business to increase profit and cut unnecessary waste, to assure the business's long-term success. Some changes include offering 24-hour delivery, which has

increased revenue by approximately $20,000.00 per month, introducing catering services, which has increased revenue by approximately $6,000.00 to $12,000.00 per month, and staying open later and introducing cocktails and specialty drinks which has increased daily alcohol sales by approximately twenty-five percent (25%). New management also is exploring aggressive marketing, such as online coupons, which has increased yearly sales by approximately $97,000.00 at Ms. Choi's other restaurant, Bann.

### D. Factors Causing Lower Revenue in the Summer have been Largely Resolved

20. As stated in the Choi Affirmation, the Debtor has managed to increase business despite several significant factors beyond its control. Contrary to statement made by the Landlord's property manager, Christopher Zieger, in his Affidavit (the "Zieger Affidavit"), there was a significant slowdown in business during the summer months. A MERS outbreak in South Korea caused a significant downturn in tourism – a large source of revenue during the summer months - in July. The Korean economy also was in a down turn which served to further decrease tourism.

21. Certain actions taken by the Landlord also reduced business. Since mid-June, scaffolding has reduced visibility of the building, which significantly reduced foot traffic. The scaffolding, which the Landlord has advised the Debtor is scheduled to be removed in October, has not yet been taken down. A picture of the scaffolding is annexed to the Choi Affirmation as **Exhibit 2**. Similarly, new signage was to be ordered by the Landlord in mid-July, and designs were promptly provided to the Landlord within four (4) days of its request. Despite this, the signs were not put up until recently and are not even located over the restaurant. A picture illustrating the signage is annexed to the Choi Affirmation as **Exhibit 3**. These combined factors resulted in reduced business and lost revenue of approximately $70,000.00 in June and

$20,000.00 in July.

22. The Landlord also has refused to grant permissions necessary and beneficial to the operation of the restaurant. Ms. Choi, on behalf of the Debtor, submitted a letter of intent requesting permission to make certain superficial and aesthetic changes to the restaurant. One such change was to update the wooden tabletops with marble and replacing the chairs to match. A copy of the letter is annexed hereto as **Exhibit 5**. The Landlord has refused to grant permission without renderings and engineering plans, which are inapplicable to such changes. Ultimately the changes – which would have benefited the restaurant – were not made.

23. The Landlord also has taken steps that make required upgrades and modifications to the restaurant unnecessarily difficult and expensive. The Debtor had a FDNY violation from 2013 – prior to the Petition Date – and previous management started work to fix it but ran out of funds. Upon taking over management of the Debtor, Ms. Choi had work resumed to remedy the violation by fixing the kitchen exhaust. The building's chief engineer complained that the Landlord had not pre-approved the electrician and required him to leave until the Debtor provided a $5 million insurance policy. While the Debtor ultimately provided what was requested, and the work was completed, when the Debtor requested permission from the Landlord to test the system the Landlord sent an email asking how the work was completed without proper approval. It is unclear why the Landlord would attempt to prevent the Debtor from correcting a violation in the restaurant.

24. Additionally, the restaurant has had ongoing problems with overflow of the grease traps. One potential remedy for this is to "snake" the entire pipe. The Debtor repeatedly has offered to do this at its own expense but has received no response from the Landlord.

25. Cash flow issues also were caused by certain operational expenses. Notably, the

Debtor's insurance expired and needed to be renewed at a $22,000.00 (a $6,000.00 increase), and a workers' compensation audit resulted in a $43,000.00 assessment.[5] The Debtor also satisfied $6,200.00 in fines resulting from FDNY violations dating back to 2013, paid approximately $9,000.00 to resolve kitchen exhaust violations, and incurred another $30,000.00 in bankruptcy-related expenses. While none of these expenses by itself is significant, in the aggregate they created a substantial expense.

## CONCLUSION

26. The Debtor is not significantly behind in its rent, and will be current by November 30. Further, the unanticipated downturn in business created by a number of factors – none of which were under the control of the Debtor's new management – has been resolved. Granting the Landlord's request for relief from stay to pursue remedies against the Debtor in State Court will serve only to bankrupt a viable company and deprive creditors of what they are due under the Plan. Moreover, the Landlord will receive payment in full long before it would be able to complete an action in State Court.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY WAS LEFT BLANK]**

---

[5] PTH has paid approximately $13,000.00 of the assessment to date. The assessment period ran from March 27, 2014 through March 7, 2015.

{00020007 }                                                         11

**WHEREFORE,** the Debtor respectfully requests that this Court enter an Order denying the relief requested in the Motion with prejudice and granting such other and further relief as this Court believes is just and proper.

Dated: October 26, 2015

Respectfully submitted,

By: */s/ Eric S. Medina*
    Eric S. Medina, Esq.
    Adrienne Woods, Esq.
    MEDINA LAW FIRM LLC
    641 Lexington Avenue
    Thirteenth Floor
    New York, NY 10022
    Tel. (212) 404-1742
    Fax (888) 833-9534
    emedina@medinafirm.com

    *Attorneys for the Reorganized Debtor*